# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00290 (RBW)** |
| **v.** | : | |
| | : | |
| **JEFFREY ALEXANDER SMITH,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeffrey Alexander Smith to five months of imprisonment and $500 in restitution.

### I.      Introduction

The defendant, Jeffrey Smith, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Smith pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of five months' incarceration is appropriate in this case.

The government is recommending a relatively lengthy period of incarceration because Smith's actions on January 6 were particularly disturbing in that, despite witnessing a violent riot already unfolding at the Capitol, he led the removal of barricades from the inside of the Rotunda

1

doors on the east side of the Capitol and attempted to open those doors to let in a mob of violent and destructive rioters. Although three police officers initially prevented him from opening the doors, Smith returned to the Rotunda doors to assist a growing mass of rioters in overwhelming the officers by sandwiching them against the doors which caused the doors to open from the inside and triggering the first and only major breach point on the east side of the Capitol (confirmed by the Capitol Police). This allowed the large mob to enter the Capitol that police had managed to repel a few minutes before, now compromising the Capitol on both the east and west sides. Smith then led those rioters upstairs. Far from being a follower simply caught up in the crowd, Smith—a former Army sergeant—quite literally led the charge to open the Rotunda doors from the inside to let in a violent mob clearly visible to him through the damaged door windows on the outside.

Also, at approximately 2:58 p.m., Smith, along with a group of other rioters, approached police officers standing guard outside an access point to the Office of the Speaker of the House. The rioters became very vocal and abusive towards the officers. At 2:59 p.m., Smith was in the front line of these rioters and only inches from the officers. At that time, Smith told the officers to "stand down" and warned them, "We're getting in there one way or another." The rioters soon physically assaulted the officers, but police body worn cameras videos are not clear on whether Smith participated in this physical assault by the rioters.

In addition, the defendant, (1) entered the Capitol after observing that fellow rioters were engaged with police officers who were deploying tear gas and flash bangs; (2) recorded a video when entering the Capitol through the Upper West Terrace entrance while alarms were blaring; (3) cheered and incited other rioters as he entered the Capitol, yelling, "We ain't going to take it," and "Let's fucking go patriots;" (4) immediately after successfully breaching the Rotunda doors from the inside to let in the violent mob, Smith pumped his fist in victory and directed the flood

of new rioters up the stairs to the third level of the Capitol; (5) later sent electronic messages revealing a total lack of remorse, writing that he was a "Patriot" who "stormed the capit[o]l," that there was "no way in hell I was going to drive 38 hours from San Diego and not walk right through the front of the capit[o]l building," and that his purpose was "To send a message that Americans are[n']t going to take a fraudulent election;" and (6) was not candid with law enforcement during his interview and minimized his involvement in the Capitol riot.

The defendant's participation in the riot that succeeded in halting the Congressional certification combined with the defendant's assistance in breaching the Rotunda doors, joining rioters to intimidate police officers doing their duty, and his lack of remorse renders a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense submitted to the Court on October 22, 2021, for the October 28, 2021 plea hearing ("Statement of Offense"), at 1-7.[1] As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Jeffrey Smith's Role in the January 6, 2021 Attack on the Capitol

Jeffrey Smith drove 38 hours from California to Washington, D.C., to attend the "Stop the Steal" rally on January 6, 2021, and specifically to hear the former President's speech.  Smith has admitted that he arrived in Washington on January 5 and attended a rally in which former National

---

[1] It is noted that the plea documents do not yet appear on the docket.

Security Advisor Michael Flynn was a speaker.  According to Smith, on January 6, 2021, Smith took an Uber from his hotel to attend the former President's speech at the White House.  Smith arrived at approximately 9:30 a.m.  Smith stated that following the President's speech, at approximately 1:15 p.m., Smith and several thousand other people began walking to the Washington Monument and then to the U.S. Capitol building.  While walking to the Capitol, Smith noticed a couple of people communicating via MBITR (Multiband Inter/Intra Team Radio) radios with earpieces, like those he used when he was in the Army.  He later stated that he did not know if these individuals were part of the security element for the event, but they looked to him like they were "SF [Special Forces] guys."  As he walked to the Capitol, Smith took photos and recorded videos on his cellphone.  *Id.* at ¶¶ 9-12.

Smith described the scene at the U.S. Capitol when he arrived as "chaos."  He heard people on loudspeakers, heard what he thought were flash bangs, and saw officers engaging rioters and deploying tear gas "all over the place."   Nevertheless, Smith crossed police lines, climbed the stairs outside the "Mall side" (west side) of the Capitol at approximately 2:30 p.m., entered the Capitol at approximately 2:34 p.m. through entrance doors that were already open, and then remained inside the Capitol for approximately 30 minutes, until 3:08 p.m.  Smith's video shows his entry into the Capitol building through the Upper West Terrace doors.  *See* Smith video, Exhibit 1.  This was confirmed by security surveillance images.  A drawing of the first (ground floor) level of the Capitol, with the Upper West Terrace doors in the red oval, is below:



Figure 1[2]

Smith's video depicts numerous individuals entering through the Upper West Terrace doors, walking through the entry hallway, and then climbing the stairs leading to the Capitol Rotunda. The stairway leading to the Rotunda is depicted within the red oval in Figure 1, above.

---

[2] This and subsequent drawings below can be found at
https://docs.google.com/document/d/1hxXJrKhtDyf-1anm6g-wgp9DNNiy0dJp4KJKiNlXyAU/edit#heading=h.56y0ktk4a1f8

Smith cheers the rioters on and yells repeatedly, "We ain't going to take it," and "Let's fucking go patriots." Alarms can be heard in the background as Smith enters the building. *Id.* Smith's video also shows that at least some of the rioters with whom he entered wore military style helmets, clothing, and gas masks. *Id.* According to Smith, he entered the Capitol Rotunda, and the photo below shows Smith, circled in red, inside the Capitol Rotunda wearing a black jacket and a Trump hat (which he at times held in his hand) and raising his cell phone:



Figure 2

The Rotunda is on the second level of the Capitol and is on the same level as the floors of the Senate Chamber on the northside of the Capitol and of the House Chamber on the southside. Security-camera footage shows that Smith entered the Rotunda area at 2:36 p.m. and proceeded toward the Rotunda doors on the east side of the Rotunda. Below is a drawing of the second level of the Capitol and the Rotunda doors (labeled as "central east doors") circled in red:



Figure 3

The Rotunda doors had been temporarily breached about ten minutes earlier by outside rioters who used hard objects, including a flagpole, to break security glass on the doors. A rioter on the inside eventually opened the door, and several officers were assaulted during that initial breach. Below is a still shot from security video at 2:27 p.m. showing the initial breach of the Rotunda doors, with a sea of rioters attempting to enter the Capitol, and an injured officer on the floor of the Rotunda after being assaulted. *See* Security footage attached as Exhibit 2.



Figure 4

A Slate reporter's 22-second video taken at 2:27 p.m. providing chilling sound during the rioters

attempt to forcibly breach the Rotunda doors is attached as Exhibit 3.  The video can also be found

at https://twitter.com/jim_newell/status/1346899789347233796.

Police officers were able to re-secure the Rotunda doors a few minutes after this initial

breach, and they used iron benches to barricade the door.  After Smith entered the re-secured and

empty Rotunda at around 2:36 p.m., he ran toward the Rotunda doors and moved one of the iron

benches barricading those doors while another rioter followed his lead and moved a second bench

and Smith moved the third bench.  *See* Exhibit 2.  Through the broken glass, Smith could see the

mass of rioters outside.  Figures 5-8, which are still shots from security footage taken from two

different angles, show Smith (circled in red) moving the benches away from the battered Rotunda



Figure 5



Figure 6



Figure 7



Figure 8

After moving the benches, Smith attempted to open the Rotunda doors and let in the mob of rioters, but three police officers arrived and prevented him from doing so by getting between Smith and the doors.  *See* Exhibit 2, and still shots contained in Figures 9 and 10, below.



Figure 9



Figure 10

After the officers stopped Smith from opening the Rotunda doors—but before they could replace the benches that Smith and the other rioter had moved—a crowd of additional rioters entered the Rotunda and started pushing toward the Rotunda doors, sandwiching the three officers between the crowd and the doors. Rather than leaving, Smith joined in the crowd pressing toward the doors, which rioters this time were able to open. Exhibit 2. The still shots in Figures 11 and 12 below show Smith pressing toward the doors and the resulting breach:



Figure 11



Figure 12.

As the mob flowed into the Capitol, Smith gave a victorious fist pump and pointed upstairs to the third level of the Capitol. Smith not only encouraged rioters to go upstairs he led rioters up to the third level. *See* Exhibit 2 and the still shots in Figures 13 and 14, below.



Figure 13



Figure 14

The third level houses the galleries for both the Senate Chamber and the House Chamber and numerous offices.  Below is a drawing of the third level of the Capitol with the stairs used by Smith

to lead other rioters to the third level circled in red:



Figure 15

One minute later, at 2:39 p.m., the Rotunda was completely overtaken by the mob entering

through the Rotunda doors that Smith had aided in breaching.  *See* Exhibit 2, and Figure 16 below.



The mob Smith let in included violent members of the Proud Boys and Oath Keepers who were dressed in full battle gear like they were going to war.  The police had been fighting this horde of violent rioters for 30 minutes to preclude them from breaking into the Capitol through the Rotunda Doors. This was the first breach on the east side of the Capitol which was now overrun.  A New York Times investigative documentary provides a distressing account of the Capitol riot including the breach of the Rotunda Doors which starts at approximately the 22-minute mark of the video. *See* https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

According to Smith, he remained in the Capitol for 29 more minutes, until 3:08 p.m. Despite extensive efforts, the government had been unable to account for defendant's whereabouts and actions during those 29 minutes.  These efforts were hampered by defendant's deletion of the videos and photographs he took inside the Capitol, except for the one evidencing his entry.  As

discussed below, Smith has admitted that he deleted the videos and photographs because he believed they were incriminating.

The government has now been able to trace Smith's whereabouts in the Capitol. After defendant's involvement in the breach of the Rotunda doors, he roamed the Capitol and returned to the Rotunda. At approximately 2:58 p.m., the defendant, along with a group of other rioters, approached police officers standing guard outside an access point to the Office of the Speaker of the House. The rioters became very vocal and abusive towards the officers. At 2:59 p.m., Smith was in the front line of these rioters and only inches from the officers. At that time, Smith told the officers to "stand down" and warned them, "We're getting in there one way or another." *See* Body Worn Camera footage, Exhibit 4. The rioters soon physically assaulted the officers with at least one officer injured, but the video is not clear on whether Smith participated in this physical altercation by the rioters. A still shot of Smith circled in red confronting the police with other rioters is below:



Figure 17

A few minutes later, at 3:05 p.m., Smith left the Capitol from the same Rotunda doors he helped breach earlier.

Smith also admitted as part of his guilty plea that he knew when he entered the U.S. Capitol Building that he did not have permission to do so, and that he paraded, demonstrated, or picketed inside the building.  Statement of Facts at ¶ 15.

### Social Media Posts

For several days after the attack on the Capitol, Smith sent messages to acquaintances, saying "I'm a Patriot," "I stormed the capital [sic]."  Statement of Facts at ¶ 13.  He further admitted that his purpose was "To send a message that Americans are[n'] t going to take a fraudulent election."  *Id.*  Smith also wrote, "There is no way in hell I was going to drive 38 hours from San Diego and not walk right through the front of the capital [sic] building."  *Id.*

### Jeffrey Smith's Interview

Smith voluntarily agreed to a telephone interview with the FBI before his arrest and an in-person interview following his arrest on January 27, 2021.  Smith gave a detailed description of what he purportedly did and saw in the Capitol.  He stated that he did not know the building was restricted at that time despite having seen the police engaging with rioters with flash bangs and tear gas and alarms blaring.  He said the Capitol is "the people's building."  Smith stated that he merely walked around the Capitol, and that he did not do anything of a violent nature.  He said he entered the Capitol because he believed something historic was going to take place, that Vice-President Pence "was doing his thing" by not certifying the election, and that he wanted his voice to be heard.   He said that the people in the Rotunda area were just walking around taking pictures and that there was no violence.  He further stated that he left the Capitol building because of the large number of people in the building.   Smith admitted to the FBI that following the riot he

deleted his Instagram account.  He said his social media contacts were calling him a terrorist because of his involvement on January 6.  He also admitted that he deleted many of the videos and photographs that he took in the Capitol because he believed they would incriminate him.  He kept the video of him entering the Capitol because it would show that he walked in unobstructed.

Smith made serious omissions and minimized his actions in the interviews.  He failed to advise the FBI that he was involved in removing the iron benches that were set up as barricades, that he attempted to open the Rotunda doors (which had already suffered damage and broken security glass), that he was attempting to bring in a throng of destructive rioters that were directly on the other side of the Rotunda doors, that he joined other rioters in the Rotunda area in sandwiching three officers in an attempt to breach the Rotunda doors, and that he was part of the group that succeeded in forcibly opening the doors to let in the mass of rioters.[3]  Smith's lack of candor is clearly evident when he advised the FBI that he left the Capitol building because there were too many people there--but in reality, he was a major cause for opening the flood gates that allowed the sea of rioters to enter the Capitol.  He also failed to tell the FBI that he was with a group of rioters that physically assaulted police officers guarding an entry point to the Speaker's Office by the Rotunda, and that he told the officers to "stand down" and "We're getting in there one way or another."

*The Charges and Plea Agreement*

On January 22, 2021, Jeffrey Smith was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On January 27, 2021, he was

---

[3] Moreover, during his FBI interview, Smith stated that at one point while he was in the Capitol building, he talked to an officer about wanting to leave the Capitol, and the officer let him go through a closed area for that purpose. The only security footage the undersigned has seen where Smith appeared to talk to a police officer and allowed to pass into a closed area was when Smith entered the Rotunda area.  That was when Smith passed officers but ran to open the Rotunda doors.  He did not leave the Capitol until he and others succeeded in opening the Rotunda doors to let in the swarm of rioters and after his threatening statement to the officers in the Rotunda almost 30 minutes later.

arrested at his home in California. On April 8, 2021, Smith was charged in a four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 28, 2021, he pleaded guilty to Count Two of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Smith agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

The defendant now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction or other illegal acts; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and what he did; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere

remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of personally assaulting others or destroying property on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants. The fact that Smith appears to have stopped just short of violence and property destruction, and the full tracing of defendant's whereabouts was only recently completed, are the only reasons he was charged with, and permitted to plead to, a misdemeanor rather than felony.

When Smith entered the Capitol grounds, he knew he was getting involved in a riot that had led to violent confrontation between police and his fellow rioters. He admitted that, as he was approaching the Capitol, he saw rioters engaging the police who were using flashbangs and tear gas. He witnessed a scene that he described as "chaos." While no police officers appear to have blocked Smith's entry into the Capitol building, there were clear signs of violence and that he was not allowed there. Indeed, he later admitted to the FBI that he believed that the entrance he used had already been breached by others. The decision to cross police lines and barricades and enter the Capitol building after seeing that chaotic scene reveal that he was not simply a tourist or peaceful protester but someone intent on, in his later words, "storm[ing] the capit[o]l."

Moreover, Smith was not content simply to be a passive participant in the breach of the Capitol. He actively encouraged other rioters as he climbed to the Rotunda, yelling repeatedly, "We ain't going to take it," and "Let's fucking go, patriots." He was the first rioter to reach the Rotunda doors after they had been re-secured following the initial breach, and he grabbed one of

the benches barricading those doors and removed it.  He then tried to open the Rotunda doors and let in an additional mob of rioters that he could see through the broken windows.  Although three officers intervened before he could get the doors open, Smith joined the growing mob that overcame those officers and succeeded in opening the doors.  Smith's action in moving two of the benches—which the officers were unable to replace before being overrun—helped clear the way for those doors to open.  And it was only the officers' temporary, and ultimately futile, intervention that prevented Smith from opening the Rotunda doors with his own hands.

As an Army veteran, Smith was well aware of the danger to police, Congressional members, staff and rioters posed by allowing another angry mob into a restricted building protected by armed officers.  Yet, far from trying to calm an already tense situation, Smith joined the crowd pressing toward the outnumbered officers (*see* Figure 11), managed to be quite near the doors when they were finally forced open (*see* Figure 12), and celebrated by pumping his fist and then pointed upstairs, directing the incoming crowd to continue further up in the Capitol (*see* Figure 13).

His behavior did not stop there.  He joined other rioters in the Rotunda in an attempt to get through a line of police officers guarding an entry point to the Speaker's Office and this interaction by the rioters resulted in assaults on the police.  Smith again was not a passive participant.  He told the officers to stand down and warned them, "We're getting through one way or another."

Smith's statements after January 6 show a total lack of remorse.  He called himself a "Patriot" and bragged about "storm[ing]" the Capitol.  He tried to justify his actions as protesting a "fraudulent election" and as based on the Capitol's status as "the people's building."  The only remorse he has displayed was after he was contacted by the FBI, and that remorse centered on the effect his arrest and conviction would have on him:  his ability to get a pilot's license, his ability

to get custody of his children following his divorce, and how his family would view him. He has not shown any remorse to date regarding the wrongfulness of rioting in the Capitol and how he endangered others.

Smith's lack of remorse is also evident in his misleading statements to the FBI. He claimed that he did not know the building was restricted at the time, that there was no violence in the Capitol, that he only took photographs and videos and that he had talked to an officer about trying to leave the building. Yet he failed to acknowledge that he had removed iron benches from the Rotunda doors and tried to open them to let in a violent mob, that he was part of the group ramming officers that succeeded in opening the doors, that he was involved with a group of rioters that assaulted police officers in the Rotunda, and that he told the officers to "stand down" and that he and the other rioters were going to go through the officers "one way or another."

Finally, Smith has admitted to destroying evidence after the riot by deleting videos and photos that he believed could incriminate him. This hampered and delayed the government's ability to fully track his actions inside the Capitol, which was not completed until recently. He also took down his Instagram account because, according to him, his social media contacts called him a terrorist. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Smith does not have any criminal convictions. ECF 33 ¶¶ 30-31. As the Court knows, the defendant has a pending domestic violence case in Colorado related to his violation of a protection order. Smith served in the U.S. Army from January 2010 until he was honorably discharged in January 2015 with the rank of Sergeant. He received several decorations, medals, badges, citations, and ribbons. Smith has generally been employed in the

24

plumbing industry since that time, but he had a period of unemployment from April 2019 until November 2021.  Smith has had various violations of conditions of release, including for his domestic violence arrest and for several failures to report to Pretrial Services.

While Smith's military service is laudable, it renders his conduct on January 6 all the more egregious. As a former military member, Smith was well aware that citizen status does not bestow upon a person the right to enter restricted government buildings. His voluntary decision to storm a guarded U.S. Government building and attempt to open secured doors and let in other rioters is shocking in light of his former military service and training. His assertion that he could enter the Capitol because it is "the people's building" is not credible--as an active service member he would have known that civilians are not allowed onto restricted military property simply because it is public property.  In this case, Smith's former military service makes his conduct on January 6 all the more troubling and demonstrates a very real need for specific deterrence in the form of incarceration.  It is also shocking that as a former decorated member the United States Army he would tell officers doing their duty and upholding their oath in defending the United States Capitol to stand down or he and the other rioters were going to go through them.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was a year ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Jeffrey Smith's actions, words, post-arrest interview, and text communications clearly demonstrate the need for specific deterrence for this defendant.  Smith marched past police lines, knew the police had deployed tear gas and flash bangs, and ignored the blaring alarm resonating through the Capitol.  Knowing all this, Smith took videos and photos to memorialize what was happening, but then destroyed the videos and photos that he thought would incriminate him.  Smith also attempted to open the Rotunda doors to let in the mob of rioters on the other side and was only stopped by police who were quickly outnumbered. He remained near the Rotunda doors and assisted other rioters who succeeded in opening the doors to allowing a sea of rioters, including teams of rioters dressed for war, to pour into the Capitol.  Smith celebrated this breach by pumping his fist, and later boasted about how he was a "Patriot" who "stormed" the Capitol.  Smith then

was involved with other violent rioters in the Rotunda and participated in their attempt to intimidate and overtake the police.

In addition to his unusually serious conduct, his lack of remorse underscores the need for specific deterrence. Smith explained both while entering the Capitol and when he communicated with acquaintances after the riot that "We ain't going to take it," and that he was sending "a message that Americans are[n'] t going to take a fraudulent election." These statements reveal a lack of remorse and raise the risk that Smith will engage in future criminal conduct where he disagrees with the result of an election.

Additionally, as the Court heard during a recent hearing, a few weeks after Smith was arrested in this case, he was removed from an airplane in Wisconsin for refusing to wear a required protective mask on the plane. Smith was so belligerent that the airline had to call in police. Although he was not arrested that day, this behavior and Smith's own words demonstrate a possibility of future violence that requires a significant sentence in order to afford adequate deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Two of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C

---

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant's actions in the Capitol contributed to the riot, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "record" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted'

disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court may consider the sentences imposed in several other cases.  In *United States v. Mariotto*, 21-cr-094 (RBW), this Court sentenced the defendant to 36 months' probation where the defendant entered the Capitol through a damaged door, took a selfie-style photograph in the Senate Gallery, recorded assaults against the police inside the Capitol, attempted to open doors while chanting "where are the traitors," made unremorseful comments on Facebook and minimized his involvement in a media interview, deleted his Facebook account, and had no criminal record.   In *United States v. Spencer*, 21-cr-00147 (CKK), the defendant received

a 3-month sentence of incarceration where she entered the Capitol with her husband and minor child, was involved in a verbal altercation with a "counterprotester" outside, entered Speaker Pelosi's offices when staffers were hiding, tried to get onto the house chamber when members of Congress were hiding inside, and minimized her conduct in her interview.  In *United States v. Scavo*, 21-cr-00254 (RCL), the defendant was sentenced to 60 days incarceration based on entering the Capitol, taking video of the violent breach of the Rotunda doors, and making unremorseful statements.  And in *United States v. Tryon*, 21-cr-420 (RBW), this Court sentenced the defendant to 50 days of imprisonment where officers pepper-sprayed him and hit him with a baton for refusing to comply and the defendant entered the Capitol through a door that had just been opened by someone who broke a window.

Here, Jeffrey Smith's conduct was far more serious than the cases discussed above because he took it upon himself to attempt to open the locked and secure Rotunda doors in order to let in the mob of rioters on the other side.  Then, after being stopped once by police officers, he tried again successfully as part of a crowd that overpowered three police officers.  The breach caused by Smith was the first breach and only major breach on the eastside of the Capitol and the ensuing flood of rioters, including the Proud Boys and Oath Keepers clad in body armor, merged with the rioters from the westside of the Capitol to overwhelm the Capitol and its protectors.  Smith celebrated this achievement and moved on to other parts of the Capitol, spending an additional 30 minutes inside.  Before leaving the Capitol, Smith and other rioters challenged the police at an entry point to the Office of the Speaker of the House and made very aggressive statements to them.  Smith stated, "We're getting in there one way or another."   The group he was with proceeded to engage the officers in a physical altercation.  At least one officer was injured.  *See* Exhibit 4.  Smith's behavior put many innocent people in great danger, including Congressional staff,

members of Congress and, of course, the law enforcement officers that were outnumbered, assaulted, and overrun.  Smith also celebrated his involvement on social media after the riot and made misleading statements to the FBI.   Smith's early plea and lack of a criminal record deserves some credit.  But his involvement in reopening the barricaded Rotunda doors, challenging the police doing their job, and his untruthful and unremorseful  statements puts him in the most serious category of misdemeanants and warrants a significant sentence of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of significant incarceration, while some may support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jeffrey Smith to five months' incarceration, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by

imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early

acceptance of responsibility and lack of criminal record.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY


By:       _____
          GEORGE ELIOPOULOS
          D.C. Bar No. 390601
          Assistant United States Attorney
          U.S. Attorney's Office
          555 4th Street, N.W., 4th Floor
          Washington, D.C.  20530
          Office: 202-252-6957
          george.p.eliopoulos@usdoj.gov